A. S. JEWELL, Admistrator of Estate of John D. Garrison Deceased, Appellant, v. J. L. POSEY, Appellee.

Action Against Contractor for Goods Sold Subcontractor: AGENCY: JURY QUESTION: EVIDENCE. This action is against
1   a contractor for goods sold and delivered his subcontractor; *held*, that the evidence is of such a nature that the question of the subcontractor's agency for his principals should have been submitted to the jury.

Same: EVIDENCE CONSIDERED: JURY QUESTION. There was evi-
2   dence that defendant orally promised to pay the bills of his subcontractors and to settle all their accounts so long as there was anything due them, though there was no showing of a settlement between defendant and his subcontractors or that there was anything due, still the case should have been submitted to the jury to determine whether defendant agreed to pay the bills unconditionally, and whether the condition had been fulfilled or waived.

*Appeal from Harrison District Court.*—HON. W. R. GREEN, Judge.

MONDAY, FEBRUARY 2, 1903.

ACTION for goods and merchandise sold and delivered to Ray Bros. Defendant denied all liability. Directed verdict for defendant, and plaintiff appeals.—*Reversed*

· *Sanford H. Cochran* for appellant.

*S. I. King* for appellee.

DEEMER, J.—The goods for the value of which this action is brought were not, except as hereafter stated, delivered to defendant in person.     They seem to have been 1. AGENCY: jury furnished various employes of Ray Bros., a question: evidence.   copartnership, and were charged to that firm. Plaintiff claims that Ray Bros. were in fact the agents of defendant, or, if this be not true, that defendant orally ordered, and agreed to pay for the goods so furnished.     A statement of account has been certified to this court, and while it now shows that the goods were charged to defendant and Ray Bros. jointly, we think that defendant's name has been added to the account since it was closed, as the result of an afterthought, and that the goods were in fact charged to Ray Bros. alone.

The evidence tending to show  defendant's liability is as follows:   One of the firm of  Ray  Bros. testified:   "Q. Did you have any conversation with Mr. J. L. Posey, the defendant in this case, at any time, in which he gave you any oral directions about buying merchandise of the character mentioned in Exhibit A  at different places?   A. Yes, sir.   Q. State what the conversation was.   Give the substance of it.   A. Why, in the beginning, when I came up to look over the contract which Mr. Posey had to let, I told him that I did not have sufficient funds to carry on the work; that I did not have capital to buy feed, grain, etc., for the stock; and he told me he would look out for that, which he did.   Q.  What did he say by way of authorizing you or directing you to make purchases on his account of merchandise and stuff for the use of the teams and the men?   A. Well, he told me to make such arrangements in Logan that I chose to, and that he would settle it, and hold back out of our pay, and he did so.   I was a

subcontractor under Mr. Posey, and the men referred to in the itemized statement Exhibit A were the men working under the subcontract. I know of four or five places where, in pursuance of the authority and directions referred to, purchases were made, and Mr. Posey paid the bills in accordance with the contract made with me. Mr. Posey told me that he would settle my accounts, and straighten up everything for me. He said he would straighten up everything for me. He said he would straighten all of the accounts up, as he agreed to do, and look after them. Mr. Posey did not agree to pay any bills beyond what my work came to. We never had any settlement. My first conversation was about the 8th of May, at Mr. Posey's camp, on the Illinois Central right of way, east of town. Mr. Posey told me he would settle all bills that were contracted in the way of feed and provisions. He did not mention any particular party. He said we could go ahead and trade at Logan, and gave us authority to contract said bills, and he would settle them. When we took the contract, in the beginning, he said that he would stand good for all the goods we bought to feed our teams and run ourselves in the way of provisions. Mr. Posey and I never had that settlement. I do not know what proportion of this feed was used by his horses. The time was not long. It was between the 26th of June until the 5th of July,—were the dates that we worked on this account in question. During the time I issued a few feed orders that were handed in by Mr. Garrison. Q. What I want to get at is— The only purpose of having the question answered is to find out, in a general way, if this particular feed bill was used to feed Mr. Posey's horses at work on his grade? A. Yes, sir. Q. What did you say to Mr. Garrison at any time with reference to his account, and Mr. Posey having directed you to get the feed there for Mr. Posey? A. Well, I wanted to know if we could make such arrangements at the time to

get the feed, and he said that he would see Mr. Posey; and so he afterwards sent his men down to the grade, and said for me to come up. I came up to the office or feed store, and he said: 'It is all right, Mr. Ray. I have made arrangements with Mr. Posey, and Mr. Posey says he will pay the bill,—for you to send in your orders and get what you want.' Mr. Posey and I never had any settlement, and I do not know just what part of the feed bill it was. Mr. Posey never refused to settle with me."

Another member of the firm of Ray Bros., testified: "Q. What did Mr. Posey ever tell you (this defendant) about having made arrangements with Mr. John D. Garrison about the feed and provisions for the men and horses up there? A. Why, he came down— He was passing down by there to his work, and he wanted to know if we had got our feed all right. I said: 'Yes, sir; we are getting it now all right; and it was very kind of you to make arrangements with Mr. Garrison to get our feed there, which was so much more convenient for us to get our feed there, than to send the teams to the country to get the feed.' This conversation was while we were doing the work down there. I do not recollect what day of the week or the month it was in. Q. What, if anything, did Mr. Posey say to you in reply, when you told him it was kind in him to make arrangements to get feed at Mr. Garrisons? A. Well, he said that was all right. He said he was glad we was getting our feed."

This is all the evidence bearing upon the issues involved. We think, in view of the fact that Garrison, the man who furnished the goods, is dead, and cannot give his version of the transaction, that the evidence as to the conversation had by one of these witnesses with defendant relating to the arrangements made with Garrison, plaintiff's intestate, the unchallenged hearsay evidence regarding Garrison's statements, and the evidence that part o

the goods were actually used by defendant, the case should have gone to the jury on the question of agency. Mechem, Agency, section 106.

There were two counts in the petition, the material part of the second being as follows: "That said account for the goods so sold and delivered was created under and by authority of an oral agreement made between the plaintiff and defendant herein, by which the plaintiff agreed to deliver to Ray Bros. and other persons in their employ, by defendant's oral order, goods and merchandise, from time to time, while they were employed upon the construction of the Illinois Central Railroad bed. That in reliance upon said agreement, and treating the same as an oral order and direction of the said J. L. Posey, the plaintiff furnished all the goods specified in said account to Ray Bros. and their employes, and that the defendant orally agreed to pay said bill, but refused and neglected to do so.'"

No attack was made on this count, nor were any objections interposed to the evidence offered to sustain it. The trial court was evidently of opinion that, while this

2. SAME: evidence considered: jury question.

evidence tended to show a contract between Ray Bros. and defendant for the benefit of plaintiff and others who furnished goods, yet as it also appeared that payments were to be made by defendant only so long as there was something due from defendant to said Ray Bros., and that, as plaintiff had failed to show there was anything due, there could be no recovery. It is true that one of the witnesses stated that defendant did not agree to pay bills beyond what Ray Bros.' work amounted to; but he also stated that defendant told him he would settle all their accounts, and look after them, as he had agreed to do. This was evidently after the work was finished; and, while it is true there had been no settlement between Ray Bros. and Posey, yet it was for the jury to say from all the evidence whether or not defendant did agree to pay these bills unconditionally,

—whether or not the condition had been fulfilled, or, if not fulfilled, waived.    Moreover, one of the witnesses stated that defendant held back the amount of plaintiff's bill from Ray Bros.' account.    It will be observed that defendant does not rely on the statute of frauds; hence that question is not in the case.    We mention this to avoid misinterpretation of the opinion.    It should also be observed that no claim is made that plaintiff or his intestate is not in privity to the contract.    We think that, on the issues as presented, the case should have gone to the jury.
—REVERSED.